Next case on calendar for argument is Bifelt v. State of Alaska. Before we proceed with this case, on behalf of the court, I would like to express the sympathy of the court toward the relatives of the deceased. Counsel for appellant, please proceed. Thank you, Your Honor. Welcome to Alaska and welcome back, Judge. Anyway, I wanted to start here by saying that, well, when at least four police officers shoot and fatally wound a Native American teenager, who speaks for the decedent? The estate, in this case, provided a police practice expert who reviewed all the evidence, which included police reports, photographs, transcripts, audio and video recordings, who then, this expert authored a report supported by a sworn declaration. Therefore, the question on this appeal is, can this expert speak for this deceased young man, Tristan Bent? The lower court said no. The district court summarily rejected the expert's report and analysis. It was the only, the only sworn declaration that was offered in this case. If given due consideration, there were questions of fact, whether defendants were entitled to qualified immunity, whether they acted reasonably when setting up a scenario that resulted in the use of deadly force on a 19-year-old distraught individual, who was not born. There was no warning given to him that if he touched or attempted to pick up the gun, no warning that he'd be shot. Counsel, I'm hesitant to interrupt your animated presentation. You're doing a great job. But I do have a question here on the police report, because the police report seems to me to potentially be relevant to whether there was an underlying constitutional violation. But tell me how it would be relevant to whether there was qualified immunity. Because at the end of the day, regardless of whether there was a constitutional violation or a jury question on constitutional violation, we need to find that there was a case that clearly establishes that what the officers did here was unconstitutional. What is that case? That makes it unconstitutional? Well, the reasonableness of their procedure, it was not reasonable. But what is the case? In order to deny qualified immunity, we have to find that there is clearly established law that what they did was unreasonable. So what is the clearly established law that you're relying on that says what the officers did here was unreasonable? They had, well, we can look at Billington, I believe. We can look at Smith versus Hammond. We can look at Graham versus Connor. I mean, if we start going through those, here we have it. They gave him no warning. And that if he touched or attempted to pick up the stocking cap, okay, the stocking cap that was wrapped around the gun, he would be shot. As set out in our briefing, the district court erred when it relied on Billington v. Smith to dismiss the expert's report and the analysis regarding policy and law violations. Counsel, I have a question about this. Counsel? Mr. Stabovich, I have a question about the way you're analyzing this from a pretty high level. The district court thought that it didn't need to be concerned about, that might be saying it too strongly, about your expert report because he had a video. And we have case law addressing what happens even when there's conflicting declarations if there's a video and the judge can see what actually transpired. And that is the case here, right? So it seems to me that, I'm not sure your argument really addresses that when you take issue with the judge finding that your expert's report was not sufficiently persuasive to raise a material issue of fact. Well, I think the video assists us. He interpreted the video as he interpreted it. We think it was air. There is a distinguishing this between Billington and this case. And as Judge Kleinfeld found in the Billington, there was a tugging. There was, you know, where you have somebody that's locked in hand-to-hand combat, and he's losing, he's grabbing the pistol. I mean, there's a complete different scenario. And then when you go into Graham, you look at the severity of the crime here at issue. And here we're talking about a auto theft and property crimes. But we also look at where the officer's lives are in danger, and we take that really seriously. So the minute he picks up the gun, there's a serious problem. One of the sad things about our job is the number of police officer shooting cases we see, sir. And I had to tell you, so you have a chance to respond. This police officer shooting case, it strikes me as qualitatively very different. This took a long time. It's not a situation where cars screeched up and then within 30 seconds somebody got shot. I think 40 minutes is a long time. Rather than having a lot of conflicting orders being directed at this young man, there was one person speaking. And I don't know that I've ever seen a situation where an officer said, you know, you can walk away. You can walk down the road and gave him an out, which very tragically wasn't taken. But it struck me, and I just want to give you a chance to respond. It struck me that the officers in this case did a really fine job to try to deescalate. Why am I wrong? What am I missing? Well, there was three or four officers giving orders to start with. 14 minutes in is when we get Malik Jones as the negotiator. He comes in. He's got a couple guys whispering in his ear. He's talking to him. So as far as when we look at the second phase or the second of Graham, these officers weren't an immediate threat of safety. The record demonstrates there was no immediate threat. The gun was wrapped in a stocking hat, hats that we see, we wear in Alaska, we wear around stocking hats. It's wrapped in that kind of a hat. It was not pointed at anyone. OK, there's no no pointed at anyone. He didn't get it up past his his knees and never let you agree that he had a gun. He had a gun in his hand that he was lifting up. Right. Freezing. That's the problem. I missed you. You're out of your frozen and stopped. You agree that he had a gun in his hand. Yes. Sorry. I'll try one more time. Nobody saw a gun. OK, the number one, let's do that. Nobody saw a gun. They heard it sliding on pavement and he acknowledged it was so we're going to presume that there's a gun. OK, nobody saw a gun when they go and blow him away. He gets starts to grab the stocking cap and comes up, says, this is my gun and he can't get it up. What is he going to do in the stocking cap? Here's what happened. He starts to pick it up and then he's blown away. Gun drops. We see the crew come up. Up comes Dupie. He's our police chief here now. He comes up with a less. Legal shotgun. You'll see him. He kicks the gun away. OK. Still in the stocking cap. Doesn't come out of the council council. Can I just stop? Because I want I want I'm trying to understand your argument. But the report that was submitted didn't rely on this argument. Am I correct about that? The report said they should have taken less lethal maneuvers, but did the expert come in and say, oh, no one saw a gun and therefore they were unjustified because of that? No, no, no. They presumed it's a gun. OK, we're going to say it's a gun, but I'm just saying it was never nobody ever saw the gun. I mean, that's just the reality. If you look at the video. But I wanted to save a minute or two for the end. Yeah. Well, can I just ask one clarification question? Is the cons what issues are before us? Is it just the constitutional claims? Because you also had some state law claims. Have you raised those on appeals or is the report just on the Constitution? You know, excessive force. I mean, you're freezing again. I don't know if it's me or the system. I think it's you. I usually it says if it'll say it's unstable on me when I see it, but I don't see it. Well, just so I missed the answer. You are appealing the excessive force claims under state law as well as constitutional law or just under the federal constitution, 1983. Is that a yes that you're appealing under state and federal you're appealing state and federal claims? Thank you. Yes. Your Honor. Yes. And just I think it's important for the court to revisit and it's exhibit P. Okay. Exhibit P is the video. As the court noted, there's it's 41 minutes and 28 seconds before he's shot. But they what they did, the state submit or the government submitted it and they synced it. Well, the sink isn't as great as it should be. And there's 20% delay. You can see that as it starts. So it's kind of hard catching things when you start talking about these guys. But the trooper that was in charge is what is what it is. P plus trooper Lieutenant Wasserman. So counsel, yes. Is it fair to say that the officers in this case made an effort to deescalate the situation? They're always going to make an effort to deescalate by not always, but I'm just asking about this particular case. Is it fair to say that the officers in this case made an effort to deescalate before using force? Yes, they made an effort to deescalate. But what we're talking about here, too, and I want to go back to the stocking up. They show us an excerpt 314. You see the gun with the clip drop, but that isn't that isn't what's at the scene. But that's what they're going to show you afterwards. You now have to ask you a question in terms of clearly established law. Do you have a case that says where officers tried to deescalate before using force, but ultimately used deadly force? That is a clearly established violation of constitutional law. Yeah, I think if we go to tactics, if we look at Billington, it says you based merely on tactics. You can't get a violation based merely on tactics. But when we talk about we look at Hong Kong versus the city of San Jose, the events leading up to the shooting, including officers, tactics are encompassing the facts and circumstances for the reasonableness analysis. Well, I'm trying to what I'm trying to do is, you know, the Supreme Court has instructed us that for clearly established law, we cannot look using a high level of generality. We have to look at the facts of the case and then see if there is clearly established law that addresses those facts. And that's why I asked you if you had a case, because in this case, as you can see, there was an effort to deescalate and then ultimately fatal force was used. But that's why I'm trying to ask you if you can pinpoint a case that approaches that scenario where there was an extended time period of deescalation and then ultimately deadly force was used. That would be helpful if there is a case that comes close to those facts. Well, in Smith versus city of Hamlet, reasonable inquiry must weigh whether the police should have used alternative methods. And we submit this is the case. This case should have been less lethal. Tactics can be taken into account. We have an officer, Lieutenant Wasserman, who drew a line in the sand. If we look at Excerpt 151, if he reaches down and grabs his hand on the gun, shoot him. One officer he told. If he reaches down and gets his hand on the gun, shoot him. This is at 30 minutes into the confrontation. If he gets down and touches the handgun, shoot him. If he reaches down and touches the gun, shoot him. Those are all at 30, 31 minutes in the in the thing. All right, counsel, you've exceeded your time, counsel. You've exceeded your time. We'll hear from the government and then we'll give you a couple of minutes for rebuttal. Your Honor, I was going to request two minutes on rebuttal. Thank you. All right. We'll give you two minutes for rebuttal. Thank you. Well, I appreciate that. Thank you. Counsel. May it please the court, I am Assistant Attorney General Aisha Tinker Bray and I am here today on behalf of the Appalese, the state of Alaska and Alaska State Troopers Ronald Wall, Jacob Haynes, Edward Halbert and Edwin Carlson. As this court has noted that this case does not present a novel or unique situation or an application of qualified immunity, this is the quintessential qualified immunity case where immunity is necessary to protect the officers involved from the harassing litigation when they perform their duties reasonably and in line with well-established law. The operative events of September 8th, 2015 are not in dispute. The encounter with Mr. Vent was video recorded on the vehicle dash cam and audio recorded on multiple body cameras worn by the officers present at the scene, most of whom who are not defendants and Appalese in this case. In those audios and the videos, Mr. Vent speaks for himself and he speaks very clearly. So the issue is the reasonableness of the officer's use of force is a question of law. There is no dispute that Mr. Vent was stopped driving a stolen Ford Ranger. He honestly told the officers when he was stopped at the scene that he had two loaded guns in his car. He briefly stepped out of the truck at the beginning of the encounter and tossed the wrapped in a stocking cap onto the road. There is no dispute that it was a gun in the stocking cap. Not only did Mr. Vent tell the officers there was a gun in the stocking cap and that it was loaded, but it also made a distinctive metal scraping sound that the officers heard when it slid on the ground. And there's no dispute it was loaded. For approximately 40 minutes, the officers on the scene tried to negotiate with Mr. Vent to move away from the gun while he yelled and screamed at them. They tried to get him to just come talk to him. They even, as the court pointed out, offered to let him walk away from the scene with no success. Rather, Mr. Vent threatened them, he picked up the gun and he intentionally walked over and stood directly over it. Counsel, opposing counsel seems to be focused on the police practices expert and the declaration. And I think his position is that that raised the material issue of fact, which would defeat a qualified immunity. What's your response to that? I have two parts to that response, Your Honor. The first part is that in May of 2015, the U.S. Supreme Court foreclosed that issue in its city and county of San Francisco versus Sheehan case. The court held that a plaintiff cannot establish a Fourth Amendment violation based merely on the bad tactics that result in a deadly confrontation that could have been avoided. So long as the reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to the deadly confrontation was imprudent, inappropriate, or even reckless. In this case, that's for the federal claims, correct? Well, it is for the federal claims, Your Honor, but the state of Alaska analyzes the claims the same way. That's what I wanted to ask. So your position is the state of Alaska, there's not a bit of daylight between the qualified immunity that the state of Alaska offers in a tort claim. What were the negligence claims here? What were the state law claims here? There are the excessive force state law claims against the individual officers, and there is no daylight. It is the same standard as the federal and the state. So without a federal constitution violation, there is no state constitution. Okay, so if we analyze the federal constitution, that applies the same to the state? Yes. You have to reach the same result in both cases? Okay. What case, what Alaska case says that? The most prominent case is the Maness case. Could you spell that for me? M-A-N-E-S-S? Okay. I don't... That's in your brief? Yes, Your Honor, it should be. Okay. But I would submit, when we look at this expert's report, he never opines that any officer's So going to the second part, even though we can't use an expert report on its own and solely based on that report to establish a fact issue in this type of a situation, that's not actually what we have here. The state's expert opines that the officer erred by not using more force against Mr. Vend earlier in what the expert identifies as a developing suicide by cop scenario. So the expert asserts that the officer should have used the 12-gauge shotgun being bagged gun against Mr. Vend at a time when he was cooperating with the officers and not posing a threat for being aggressive. And this can all be seen on the video, particularly with exhibit P, where the video and the audio of Lieutenant Wassman, who was not involved in this litigation, are synced. And so this court has said that less lethal force is still force that has to be justified under the circumstances that are present when that force would have been used. Twenty years ago, in the Dore case, Dorely v. Rutherford, this court observed that because being bagged guns are potentially lethal at 30 feet and could be lethal at distances up to 50 feet, they are not to be deployed lightly. When you watch the video, it clearly shows that at the time that the state's expert would have the officer shoot Mr. Vend with this less lethal being bagged gun, Mr. Vend was cooperating with the officers. He had moved farther away from the loaded handgun on the ground. He was not trying to flee. He was not threatening the officers. He was not being aggressive and he was not agitated. He was sitting fairly calmly on the tailgate of the stolen pickup truck with his hands in his lap. So, in fact, the officers can be heard on the video talking about the fact that Mr. Vend was deescalating and that they thought he would be surrendering sometime in the next 30 minutes. All of this undermines any governmental interest in using that less lethal force against him at that time. In fact, when you look at the most important factor in using force, that of the immediate threats to the officer's safety and the public safety, that counter weighs against the use of force that Mr. Vend's expert would have us use. While he was sitting on the tailgate, Mr. Vend was unarmed, stationary, who did not pose any threat to the officers or the public on the scene. This court has also made it clear that the desire to resolve a situation quickly that is potentially dangerous is not the type of governmental interest standing alone that justifies the use of force that could cause serious injury. And I would suggest that includes the use of a bean bag gun when an individual such as Mr. Vend is sitting calmly on the tailgate of the truck and poses no threat to the officers. So the state's assertion in the expert report that the officers should have ended this encounter sooner with an unjustified use of force is not supported by this court's precedent. Looking at the clearly established law piece, alternatively, even if we found a constitutional violation on the officers used to force, an officer's entitled to qualified immunity on an excessive force claim when there is no clearly established law that the officer's use of force in the situation that the officer faced was unconstitutional. Here to put that question in perspective, the estate must point to some U.S. Supreme Court opinion, some Ninth Circuit decision, some decision somewhere that says what the officers were faced with deadly force against them that they cannot use reciprocal devil force. There is no such case law that I could find. In fact, in this circuit, the opposite is true. It's been well established by the U.S. Supreme Court and this court and the weight of authority by many others that the officers faced with deadly force against them may use reciprocal deadly force. In 2005, in the Smith versus City of Hemet case that appellants have referred to, the court said, I quote, where a suspect threatens an officer with a weapon such as a gun or a knife. The officer is justified in using deadly force, unquote. In 2013, this case affirmed that in the Hayes versus County of San Diego, threatening an officer with a weapon does justify the use of deadly force. The case law was beyond debate. It was well established and it was unchanged in September of 2015 when Mr. Vent grabbed the loaded gun at his feet, pointing directly at the officers, endangering not only the officers in this case, but all of the officers and the other public at the scene. So your honor, based on that, there's no constitutional violation. The law was not clearly established that anything that the officers did was unconstitutional. And I would ask that the court affirm the district court's dismissal of all the claims in this case against the appellees. Thank you. All right. Thank you, counsel. Two minutes for rebuttal. Counsel you're muted. Here I go. I'm not very computer savvy, your honor. I apologize. What I want to touch on, on the rebuttal is, and I'm talking about an excerpt 158 on the state's experts 158. Here he wants to know what time it is. Kristen Vent wants to know, Kristen Vent wants to know, what time is it? And 10 o'clock and then what day, month and year? And then he tells them. Two seasoned officers right away, Halbert and the sergeant say, that's not good. That's not good. They understand that there's something going on here. And it was the sergeant Induranga. He's the CI. He's the one I was, I was kind of thinking we should Ebola rush this guy right now and bang his ass with the 37. He was the trooper that was interviewed after, after the scene. Kristen was asked, you know, those are problems. So what does our Lieutenant Wasman say there on 158? When he turns around, I'm going to hit him. He's got the 37 mm. I'm going to hit him. That's a 38, 28. Okay. Then we go on a little later at 40, 12. He goes, no, I get 40, 28. I'm going to hit him, guys. I'm going to hit him, guys. That's 40, 28. He waits a whole nother minute. And then they shoot lethal. He's already drawn the thing in the sand. When he turns around, I'm going to hit him. He spent a whole minute. He then, he then hits him with the, with the less lethal. You see the beanbags fall there. It's still, it's him that knocked him over. But he's already drawn the line in the sand. He's got his shooters shooting their long rifles. Four of them just banging this kid in the head and all around. Only person available to speak for Tristan is the expert. That's all we have. All right, counsel, we understand your argument. I just wanted to ask you, do you agree with opposing counsel that the state law claims are assessed using the same analysis as the federal constitutional claims? I believe, I believe she is accurate. We have preserved, there was an argument that we had waived those state claims. They're not waived. We've challenged the district court's grant of summary judgment in totality. And we've argued that the court failed to consider the expert's testimony in this report. So we've preserved those- All right, thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: Rawlinson, Christen, R. Nelson